**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Driskill Agricultural Services Incorporated, an Arizona corporation, an assignee of Agricola Beltran SA de CV, an assignee of Top Yields Incorporated,<br><br>　　　　Plaintiff/ Counter-Defendant,<br><br>vs.<br><br>DiMare Fresh Incorporated, a foreign corporation,<br><br>　　　　Defendant/ Counter-Plaintiff. | No. CIV 12-426-TUC-RM (LAB)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the court is the defendant's motion for summary judgment pursuant to Rule 56, filed on November 22, 2013. (Doc. 67)

Also pending is the plaintiff's motion for partial summary judgment pursuant to Rule 56, also filed on November 22, 2013. (Doc. 69)

The plaintiff in this case, Driskill Agricultural Services, is the assignee of Agricola Beltran (Beltran), a Mexican tomato grower. The defendant, DiMare Fresh (DiMare), buys tomatoes destined for grocery stores and restaurants throughout the United States. DiMare and Beltran entered into a sales agreement for the 2012 growing season under which Beltran would supply DiMare with "good and marketable" tomatoes for a fixed price. Beltran grew and shipped the tomatoes, but DiMare refused to accept them asserting they were not of "good and marketable" quality. Beltran, through its assignee Driskill, filed this action

claiming breach of contract and bad faith. DiMare asserts counterclaims for breach of express warranty, breach of warranty of merchantability, and breach of warranty of fitness. In the pending motions for summary judgment, each party argues the other breached the explicit terms of the sales agreement.

The case has been referred to Magistrate Judge Bowman for all pretrial matters pursuant to the local Rules of Practice. LRCiv 72.2.

The court finds the motions suitable for decision without oral argument.

The motions should be denied. There remains a genuine issue of material fact as to whether Beltran offered DiMare "good and marketable" tomatoes.

FACTUAL AND PROCEDURAL BACKGROUND

In April of 2011, DiMare and Beltran entered into a settlement agreement that resolved an earlier lawsuit between the two parties. (Doc. 68, ¶ 1) Judgment was entered in DiMare's favor and against Beltran in the amount of $233,361.80. *Id*., ¶ 2. Beltran, however, was given the opportunity to pay off that judgment the following season. The parties executed a sales agreement under which Beltran, through its agent Top Yields, agreed to supply DiMare with tomatoes during the 2012 growing season, and DiMare agreed to pay Beltran a set price for each box. *Id.* at ¶ 4.

The growing season would run "from about January 1, 2012 to April 15, 2012." (Doc. 68-1, p. 8); (Doc. 68, ¶ 5) Each week, Beltran would supply 3,200 25# boxes of Mega Extra Large and/or Extra Large MG[1] tomatoes at $8.95 per box; 6,400 boxes of Large and/or Medium MG tomatoes at $7.95 per box; and 3,200 boxes of Large and/or Medium Roma tomatoes at $7.95 per box. *Id*., ¶ 4; (Doc. 68-1, p. 8) One dollar of the price per box was to be held back by DiMare and used to satisfy the judgment. Id., ¶ 7. A "load" consists of 1,600 boxes. (Doc. 79, p. 3, n. 2)

---

[1] The acronym "MG" is not defined in the sales agreement but appears to be the oxymoron "Mature Green."

- 2 -

1    Unbeknownst to the parties, the 2012 season would see a drop in the price of
2 tomatoes. (Doc. 75-1, ¶ 13); (Doc. 73, p. 3) The parties disagree as to the amount of this
3 drop.

4    According to Beltran, by February of 2012, the average market price of a 25# box of
5 MG (mature green) tomatoes fell to approximately $5.85 per box. (Doc. 75-1, ¶ 13) In late
6 December or early January, DiMare's representative, Sam Licato, reacted to this drop by
7 attempting to renegotiate the tomato prices set in the sales agreement. (Doc. 70, ¶ 9)
8 Beltran, however, refused to renegotiate. (Doc. 70, ¶ 10)

9    According to DiMare, the average price for Medium MG tomatoes was $7.50/box.
10 (Doc. 73, ¶ 7) DiMare insists it did not attempt to renegotiate the contract. (Doc. 73, ¶ 10)

11    The sales agreement specified that, "[a]ll tomatoes shall be in good and marketable
12 condition." Id., ¶ 6; (Doc. 68-1, p. 8) The parties disagree as to the meaning of this term.

13    DiMare argues that the term "good and marketable" is defined by the USDA
14 marketing standards. (Doc. 68, ¶ 9) According to DiMare, good and marketable tomatoes
15 must have "no more than 15% total average defects including not more than 1% decay, *and*
16 be no less than 90 % green and breakers[2] at shipping point." (Doc. 68, ¶ 9) DiMare supports
17 its assertion with the written expert report of Thomas A. Leming. (Doc. 68-1, p. 101) It
18 appears that Leming bases his opinion on the use of the term in the relevant market.

19    Beltran counters with the declaration of Angel Antonio Beltran Soberanes. (Doc. 75-
20 1, p. 135) Soberanes states that he negotiated the settlement agreement for Beltran and that
21 the term "good and marketable" meant that the tomatoes "needed to receive an 85% or better
22 on the USDA inspection certificates." (Doc. 75-1, ¶ 4) At no time was a color requirement
23 such as 90% green and breakers contemplated by the parties. Id., ¶ 5. He further states that
24 in prior dealings with DiMare, a color requirement was never demanded and never was a
25 load of tomatoes rejected as less than 90% green and breakers. Id., ¶ 6, 8. In addition, prior

---

[2] The USDA classifies ordinary tomatoes according to color as follows: green, breakers, turning, pink, light red, and red. (Doc. 68-1, p. 48)

- 3 -

1  to 2012, if there was a condition issue, DiMare would allow Beltran to repack the tomatoes,
2  at a cost of $1.00 per box. *Id.*, ¶ 9.

3        Tomatoes are inspected by the United States Department of Agriculture (USDA) when
4  they enter the country.  (Doc. 68, ¶ 10) DiMare maintains that all MG and Roma tomatoes
5  are inspected. *Id.* Beltran insists that Roma tomatoes are not required to be inspected. (Doc.
6  75, ¶ 10)

7        Beltran began shipping tomatoes to its sales agent, Top Yields, in late December 2011
8  or early January 2012.  (Doc. 68, ¶ 14) Top Yields salesman, Baltazar Valencia, contacted
9  DiMare's buyer, Sam Licato, and told him that he had tomatoes to sell.  (Doc. 68, ¶ 14)
10 Licato, accompanied by Cesar Parada, inspected four loads of Beltran's tomatoes in early
11 January.  (Doc. 68, ¶ 16) Licato rejected the tomatoes for condition and quality defects.
12 (Doc. 68, ¶ 17) He also found the tomatoes had "uneven and advanced coloring."  (Doc. 68-
13 1, ¶ 12) Licato inspected Beltran's tomatoes two more times approximately 7-14 days later.
14 (Doc. 68, ¶ 20) Again, he rejected the tomatoes as having the same quality and condition
15 defects. (Doc. 68, ¶ 20) When Valencia contacted Licato a fourth time, Licato sent Parada
16 to inspect the tomatoes  (Doc. 68, ¶ 21)  Parada rejected the tomatoes as having the same
17 quality and condition defects. *Id.*

18       Beltran maintains that the loads shown to Licato were all graded 85% or better on
19 USDA inspection certificates.  (Doc. 75, ¶ 19) Beltran does not state if the loads were rated
20 90 % green and breakers.

21       According to Beltran, Valencia contacted DiMare 30-40 times over the next few
22 weeks telling him that he had more tomatoes to sell.  (Doc. 75, ¶ 20) He faxed to DiMare's
23 agent, Parada, inspection reports indicating that his tomatoes were USDA 85% or better.
24 (Doc. 70, ¶¶ 18,19) DiMare's agent did not come to view the tomatoes, however. (Doc. 75,
25 ¶ 20) In February of 2012, DiMare's agent, Licato, told Valencia "not to f[*]cking call him
26 again."  (Doc. 75, ¶ 25); (Doc. 70, ¶ 21)

27       DiMare, however, disputes the allegation that it was contacted 30-40 times, or that
28 Top Yields faxed inspection certificates to Parada.  (Doc. 73, ¶¶ 17, 18)  DiMare also

- 4 -

1  disputes Beltran's assertion that its agent, Licato, told Valencia not to call him again. (Doc.
2  73, ¶ 21)

3       According to DiMare, fifty-one lots of Beltran's tomatoes were inspected during the
4  season. (Doc. 68, ¶ 13) Thirty-eight of those lots showed either more than 15% average
5  defects or less than 90% green and breakers. *Id*.; (Doc. 73, ¶¶ 27-30) It is unclear, however,
6  which of those lots were offered to DiMare under the sales agreement.

7       Beltran asserts that because DiMare did not buy any tomatoes, its production schedule
8  was interrupted. (Doc. 75, pp. 6-7) It had to find new buyers for its tomatoes, and until it
9  did that, it could not ship tomatoes into the country because its warehouses were already full.
10 *Id*. During the delay, its tomatoes began to deteriorate. *Id*. When later loads were brought
11 into the country, their condition reflected this delay. *Id*.

12      DiMare did not buy any tomatoes at all from Beltran's agent, Top Yields, pursuant
13 to the sales agreement during the 2012 season, which ended on April 15, 2012. (Doc. 70,
14 ¶22) DiMare did, however, buy 6,080 boxes of Beltran's tomatoes through another
15 distributor, Meyer, L.L.C., outside of the sales agreement. (Doc. 70, ¶23) DiMare paid
16 $5.85 per box for those tomatoes. *Id*.

17      On June 1, 2012, the plaintiff, Driskill Agricultural Services, as assignee for Beltran
18 and Top Yields, filed a complaint in this court for breach of contract and breach of the duty
19 of good faith and fair dealing. On August 24, 2012, the defendant, DiMare, filed its answer
20 and asserted counterclaims for breach of an express warranty, breach of the warranty of
21 merchantability and breach of the warranty of fitness. Driskill filed an answer to the
22 counterclaims on September 14, 2012.

23      On November 22, 2013, DiMare filed its pending motion for summary judgment and
24 Driskill filed its pending motion for partial summary judgment. (Doc. 67); (Doc. 69) Each
25 party argues the other breached the explicit terms of the sales agreement.

26

27      <u>Standard of Review: Summary Judgment</u>
28      Summary judgment is appropriate only "if the movant shows that there is no genuine

1 dispute as to any material fact and the movant is entitled to judgment as a matter of law."
2 Fed. R. Civ. P. 56(a). There is such a dispute "if the evidence is such that a reasonable jury
3 could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
4 242, 248, 106 S.Ct. 2505, 2510 (1986).

5       The initial burden rests on the moving party to point out the absence of any genuine
6 issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553
7 (1986). "Where the moving party will have the burden of proof on an issue at trial, the
8 movant must affirmatively demonstrate that no reasonable trier of fact could find other than
9 for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).
10 "Where the non-moving party bears the burden of proof at trial, the moving party need only
11 prove that there is an absence of evidence to support the non-moving party's case." *In re*
12 *Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

13       Once satisfied, the burden shifts to the nonmovant to demonstrate through production
14 of probative evidence that an issue of fact remains to be tried. *Celotex,* 477 U.S. at 324, 106
15 S.Ct. at 2553. Summary judgment is appropriate "against a party who fails to make a
16 showing sufficient to establish the existence of an element essential to the party's case, and
17 on which that party will bear the burden of proof at trial." *Thomas v. Douglas*, 877 F.2d
18 1428, 1430 (9th Cir. 1989).

19       "In judging evidence at the summary judgment stage, the court does not make
20 credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless,*
21 *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most
22 favorable to the nonmoving party." *Id.*

23
24       <u>DISCUSSION</u>
25       "[I]n an action based on breach of contract, the plaintiff has the burden of proving the
26 existence of a contract, breach of the contract, and resulting damages." *Chartone, Inc. v.*
27 *Bernini*, 207 Ariz. 162, 170, 83 P.3d 1103, 1111 (App. 2004). In its motion for summary
28 judgment, DiMare argues that 75-80% of Beltran's tomatoes were not "good and

1 marketable." Accordingly, it concludes Beltran breached the contract as a whole and
2 summary judgment is appropriate on all claims and counterclaims. (Doc. 67, pp. 13-15)

3 Whether Beltran's tomatoes were "good and marketable," however, depends on the
4 definition of the term. DiMare argues that the term "good and marketable" includes a color
5 standard. Beltran, however, presents evidence that contradicts DiMare's interpretation of the
6 term.

7 The term "good and marketable" appears in the contract, but there is nothing within
8 the four corners of the document that defines the term. Accordingly, there is an ambiguity
9 as to whether or not a color standard should be incorporated into the term as it is used in the
10 contract. "Under Arizona's parol evidence rule, where an ambiguity exists on the face of a
11 document or the language admits of differing interpretations, parol evidence is admissible
12 to clarify and explain the document." *Johnson v. Earnhardt's Gilbert Dodge, Inc.* 212 Ariz.
13 381, 384, 132 P.3d 825, 828 (2006) (punctuation modified). "The court may also admit
14 evidence to determine the intention of the parties if the judge finds that the contract language
15 is 'reasonably susceptible' to the interpretation asserted by its proponent." *Id*.

16 Beltran offers the declaration of Angel Antonio Beltran Soberanes, who negotiated
17 the sales agreement for Beltran. (Doc. 75-1, p. 135) According to Soberanes, the term "good
18 and marketable" meant that the tomatoes "needed to receive an 85% or better on the USDA
19 inspection certificates." (Doc. 75-1, ¶ 4) He further states that at no time was a color
20 requirement contemplated by the parties. *Id*., ¶ 5. He maintains that in prior dealings with
21 DiMare, a color requirement was never demanded, and never was a load of tomatoes rejected
22 as less than 90% green and breakers. *Id*., ¶¶ 6, 8.

23 The evidence offered by Soberanes establishes a genuine dispute as to whether the
24 term "good and marketable" included a color requirement. Accordingly, summary judgment
25 in favor of DiMare should be denied.

26 DiMare further argues in its reply brief that Beltran failed to offer the quantity of
27 tomatoes required by the sales agreement on a weekly basis. DiMare maintains Beltran did
28 not offer it any Roma tomatoes at all. The court, however, does not consider arguments

- 7 -

1 made for the first time in a reply brief. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

2 In its motion for partial summary judgment, Beltran argues that Dimare's failure to
3 accept its tomatoes was a breach of contract because "there is no genuine dispute of material
4 fact that all the loads of Beltran tomatoes that were presented to DiMare for delivery under
5 the Produce Sales Agreement were in good an marketable condition." (Doc. 69, p. 6)
6 Beltran is incorrect. DiMare presents expert evidence that the term "good and marketable"
7 incorporates a color requirement. (Doc. 68-1, p. 101); *see also National Housing Industries,*
8 *Inc. v. E. L. Jones Development Co.*, 118 Ariz. 374, 378, 576 P.2d 1374, 1378 (App. 1978)
9 ("It is true that a professional custom within a particular geographic area may be used to
10 establish the terms of a contract."). Accordingly, there remains a genuine dispute as to
11 whether the "good and marketable" standard incorporates a color requirement. Summary
12 judgment in Beltran's favor also should be denied.

13 Beltran further argues that it is entitled to summary judgment because DiMare
14 anticipatorially repudiated the contract. According to Beltran, its representative called Licato
15 and Parada 30-40 times over a two week period and faxed the tomatoes' inspection
16 certificates, but the two men refused to examine the tomatoes. (Doc. 69, p. 8) Licato
17 affirmatively told Top Yields "not to f[*]cking call him again." (Doc. 70, ¶ 21)

18 While this behavior might constitute an anticipatory repudiation, DiMare offers
19 evidence disputing Beltran's version of events. *See* (Doc. 73, ¶¶ 17, 18); (Doc. 73, ¶ 21)
20 Accordingly, there is a genuine issue of material fact here, and Beltran is not entitled to
21 summary judgment.

23 RECOMMENDATION:

24 The Magistrate Judge recommends the District Court, after its independent review of
25 the record, enter an order

26 DENYING the defendant's motion for summary judgment filed on November 22,
27 2013 (Doc. 67) and

28 DENYING the plaintiff's motion for partial summary judgment also filed on

- 8 -

1  November 22, 2013.  (Doc. 69)

2   Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within
3  14 days of being served with a copy of this report and recommendation.   If objections are
4  not timely filed, the party's right to de novo review may be waived.  *See U. S. v. Reyna-*
5  *Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 900 (2003).
6  The Local Rules permit the filing of a response to an objection.  They do not permit the filing
7  of a reply to a response.

9   DATED this 31st day of July, 2014.

*[signature]*
Leslie A. Bowman
United States Magistrate Judge

- 9 -