1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                         **FOR THE DISTRICT OF ARIZONA**
8

9   Driskill Agricultural Services Incorporated,        No. CV-12-00426-TUC-RM

10                        Plaintiff,                     **ORDER**

11  v.

12  Dimare Fresh Incorporated,

13                        Defendant.

14         Plaintiff Driskill Agricultural Services ("Driskill"), as assignee of Mexican

15  tomato-grower Agricola Beltran ("Beltran") and Beltran's agent Top Yields, initiated this

16  lawsuit by filing a Complaint against Defendant DiMare Fresh ("DiMare") for breach of

17  contract and breach of the duty of good faith and fair dealing.   DiMare asserted

18  counterclaims for breach of express warranty, breach of the warranty of merchantability,

19  and breach of the warranty of fitness.   On November 22, 2013, DiMare moved for

20  summary judgment and Driskill moved for partial summary judgment.   Pending before

21  the Court is a Report and Recommendation ("R&R") issued by Magistrate Judge Leslie

22  A. Bowman that recommends denying both parties' summary judgment motions.

23         The dispute between the parties arises out of a produce sales agreement in which

24  Beltran agreed to supply DiMare with "good and marketable" tomatoes for a set price per

25  box during the 2012 growing season.   DiMare argues that there is no genuine dispute of

26  material fact that Beltran failed to supply "good and marketable" tomatoes as required by

27  the sales agreement.   Driskill argues that there is no genuine dispute of material fact that

28  all tomatoes presented to DiMare for delivery under the sales agreement were in "good

1    and marketable" condition and that DiMare breached the agreement by refusing to take

2    delivery of the tomatoes presented.   Driskill also argues that undisputed evidence

3    demonstrates that DiMare clearly and unequivocally repudiated the sales agreement.

4        The Magistrate Judge found that there is a genuine dispute as to whether the term

5    "good and marketable" in the sales agreement incorporated a color requirement, and

6    recommended denying both parties' summary judgment motions on this ground.   The

7    Magistrate Judge further found that there is a genuine issue of material fact as to whether

8    DiMare's behavior constituted an anticipatory repudiation of the sales agreement.

9        Both parties filed objections to the Magistrate Judge's R&R.   In its objections,

10   DiMare argues that there is no factual dispute that a color requirement was a term of the

11   sales agreement because there is no dispute that "good and marketable" tomatoes must

12   meet USDA marketing standards, and USDA marketing standards require no less than

13   90% of mature green tomatoes in each load to be "green and breakers" in color.   Driskill

14   alleges that both parties to the sales agreement understood the "good and marketable"

15   requirement to mean tomatoes grading 85% or better on United States Department of

16   Agriculture ("USDA") inspection certificates, and that a color requirement was never

17   agreed to by the parties.   Driskill argues that the Magistrate Judge erred by relying upon

18   inadmissible evidence in finding a genuine dispute as to whether the "good and

19   marketable" requirement incorporated a color standard.   Driskill further argues that the

20   Magistrate Judge erred in finding that DiMare offered admissible evidence sufficient to

21   controvert Driskill's evidence of anticipatory repudiation.

22   **I.    The "Good and Marketable" Requirement**

23       DiMare argues that USDA marketing standards require no less than 90% of

24   mature green tomatoes in each load to be "green and breakers" in color, citing USDA

25   Inspection Instructions and USDA Standards for Grades of Fresh Tomatoes.   The USDA

26   Inspection Instructions note that "[c]olor, ripeness and firmness are important factors in

27   determining the marketability of tomatoes," and that "practically all tomatoes are green"

28   at shipping point.   (Doc. 68-1, ex. 4 at 26-27).   The USDA Standards provide color

classifications that "may be used, when specified in connection with the grade statement, in describing the color as an indication of the stage of ripeness of any lot of mature tomatoes of a red fleshed variety."  7 C.F.R. § 51.1860.  If a color classification is specified in connection with the grade statement, at least 90% of the tomatoes in the lot must be of the color specified, but there is no requirement that at least 90% of the tomatoes be "green and breakers" for the tomatoes to be considered "good and marketable."  *See* 7 C.F.R. § 51.1861(f).

The only record evidence clearly specifying a 90% "green and breakers" requirement is the report and testimony of DiMare's expert, Thomas A. Leming.  In his report, Mr. Leming states: "In my opinion, DiMare could expect to receive," under the sales agreement, "tomatoes with less than 15% total defects, including no more than 1% decay and showing no less than 90% Green & Breakers, as reflected on USDA inspection certificates."  (Doc. 68-1, ex. 5 at 1).  Mr. Leming testified that the 15% total defects and 90% "green and breakers" requirements were "the two criteria that, *in my mind*, would establish that tomatoes coming across the border would meet the definition of 'good and marketable.'"  (Doc. 72-1, ex. 3 at 28:15-20 (emphasis added)).  Mr. Leming indicated that he "used the figure of 90 percent or more Green & Breakers" as one of the criteria because "the contract was for mature green tomatoes."  (*Id.* at 28:21-24).

Driskill argues that Mr. Leming's opinion is not admissible to determine the parties' intended meaning of the term "good and marketable," and that the Magistrate Judge accordingly erred in relying upon it.  Where, as here, a contractual term is ambiguous, courts applying Arizona law may admit parol evidence to clarify and explain the document.  *See Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006).  Evidence of "a professional custom within a particular geographic area may be used to establish the terms of a contract."  *Nat'l Hous. Indus., Inc. v. E.L. Jones Dev. Co.*, 576 P.2d 1374, 1378 (Ariz. App. 1978).  The Magistrate Judge assumed that Mr. Leming based his opinion regarding the meaning of the term "good and marketable" on the use of that term in the relevant market, but the Court has not found support in the record for that

assumption.  Mr. Leming's report does not demonstrate that Mr. Leming has experience in the particular geographical area at issue, and it does not state that Mr. Leming based his opinion regarding the meaning of the term "good and marketable" on professional custom within that area.  Both Mr. Leming's report and testimony indicate that the 90% "green and breakers" requirement arises from Mr. Leming's own interpretation of the terms of the produce sales agreement.  Expert witnesses are generally not permitted to provide legal opinions concerning the meaning and effect of contractual terms.  *See Energy Oils, Inc. v. Mont. Power Co.*, 626 F.2d 731, 737 (9th Cir. 1980) (district court erred by "admitting testimony of expert witnesses concerning their opinions as to the legal effect of the agreements and also by permitting a witness to express the subjective intent of the parties in entering into the agreements"); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (district court erred by allowing expert to provide "legal opinions as to the meaning of the contract terms at issue"); *Messina v. Midway Chevrolet Co.*, 209 P.3d 147, 152-53 (Ariz. App. 2008) (trial court did not abuse discretion in refusing to consider expert testimony concerning the meaning of a contractual term); *Tavilla v. Blue Cross & Blue Shield of Ariz., Inc.*, 2014 WL 4473638, at *4 (Ariz. App. Sept. 11, 2014) (trial court did not abuse discretion in refusing to consider expert opinion because opinion would not have assisted court in interpreting contract at issue); *see also Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993) (courts should not consider parol evidence "that has no probative value in determining the parties' intent").

"When interpreting a contract . . . it is fundamental that a court attempt to 'ascertain and give effect to the intention of the parties at the time the contract was made if at all possible.'"  *Taylor*, 854 P.2d at 1139 (quoting *Polk v. Koerner*, 533 P.2d 660, 662 (Ariz. 1975)).  If "parties use language that is mutually intended to have a special meaning, and that meaning is proved by credible evidence, a court is obligated to enforce the agreement according to the parties' intent."  *Id.*  Here, the testimony of both signatories to the produce sales agreement establishes that the parties intended the term

"good and marketable" to mean tomatoes that met the standards to grade 85% or better on USDA inspection.  Angel Antonio Beltran Soberanes, who signed the agreement on behalf of Beltran, testified:

> Q. What was the requirement under that contract in terms of the quality or condition of the tomatoes?
> A. 85 percent or better.
> Q. That was your understanding when you entered into the contract?
> A. That is correct.
> Q. And were there any other requirements regarding quality or condition in the contract?
> A. No.

(Doc. 75-1, ex. 4 at 68:7-15).  Similarly, Sam Licato, who signed the agreement on behalf of DiMare, testified:

> Q. Under the terms of this Produce Sales Agreement DiMare was obligated to buy all tomatoes that were presented that were in good and marketable condition; is that correct?
> A. That's correct.
> Q. The tomatoes graded 85 percent [or] better on the USDA inspection, DiMare was obligated to do that?
> A. If they met the standards for 85 percent or better, yes.
> Q. So that was "yes" to my question, right?
> A. Yes.
> Q. And every load that was presented for purchase that was above 85 percent DiMare was obligated to purchase, correct?
> A. Yes.
> . . . .
> Q. And the only quality requirement set forth in this contract is that the tomatoes be in good and marketable condition, right?
> A. 85 percent or better, which is a number one tomato.

(Doc. 75-1, ex. 3 at 36:21-37:10, 37:19-23).

There is no evidence that the parties discussed or negotiated a requirement that tomatoes supplied under the agreement had to be at least 90% "green and breakers" to be considered "good and marketable."  In fact, Mr. Licato testified that he "would never buy tomatoes green" and "always buy[s] them gassed."  (Doc. 75-1, ex. 3 at 78:20-21; *see generally* 77:10-78:21).  This testimony generally corresponds to a sworn declaration by Mr. Beltran stating that, in the parties' prior dealings, DiMare's practice was "to monitor the color of the tomatoes in the warehouse, and take delivery when the load reached the color specification required by DiMare's ultimate customer."  (Doc. 75-1, ex. 13 at ¶ 7).

Because Mr. Leming's opinion regarding the meaning of the term "good and

1   marketable" appears to be based on his own interpretation of the parties' contract rather

2   than on professional custom in the relevant area, and because the opinion conflicts with

3   the intended meaning of the term testified to by both signatories to the agreement, Mr.

4   Leming's opinion fails to create a genuine dispute as to whether the sales agreement

5   incorporated a 90% "green and breakers" color requirement.  It did not.

6          Nevertheless, there remains a material factual dispute regarding whether Driskill

7   offered DiMare "good and marketable" tomatoes under the sales agreement.  Mr. Licato

8   testified that the tomatoes he inspected did not meet the standards for grading 85% or

9   higher on USDA inspection.  (*See, e.g.*, Doc. 75-1, ex. 3 at 50:2-9; *id.* at 65:14-18).

10  Though Driskill presented evidence of USDA inspection certificates reflecting scores of

11  85% or better, there remain factual issues regarding whether the certificates correspond to

12  loads presented to DiMare under the produce sales agreement and whether DiMare saw

13  the certificates.  (*See, e.g.*, Doc. 73 at ¶¶ 13-15, 18; Doc. 75-1, ex. 3 at 65:19-25).

14  Accordingly, the Court will adopt the Magistrate Judge's recommendation to deny

15  summary judgment in favor of either side on the issue of whether Beltran offered DiMare

16  "good and marketable" tomatoes under the sales agreement.

17         **II.   Anticipatory Repudiation**

18         The Magistrate Judge recommended denying summary judgment on the issue of

19  whether DiMare repudiated the sales agreement.  Driskill alleges that there is insufficient

20  admissible evidence from which a reasonable trier of fact could find in DiMare's favor on

21  this issue.  The Court agrees with the Magistrate Judge that a material issue of fact

22  remains with respect to this issue.  Driskill alleges that Beltran contacted Mr. Licato 30-

23  40 times after his last inspection of tomatoes, but Mr. Licato testified that "[n]obody ever

24  talked to [him] about buying any more tomatoes" after his last inspection.  (*See* Doc 75-1,

25  ex. 3 at 50:24-51:1; *see also id.* at 42:12-17 ("I called him up and told him . . . 'when you

26  get the right kind of tomatoes that will make grade, call me up and we will look at them

27  and if they're good enough we'll take them.'  And he never called me again.").

28  . . . .

III.     Conclusion

Because there remain genuine issues of material fact regarding whether Beltran offered DiMare "good and marketable" tomatoes under the sales agreement and whether DiMare repudiated the agreement, the Court agrees with the Magistrate Judge that both parties' summary judgment motions should be denied.

Accordingly,

**IT IS HEREBY ORDERED** that the Magistrate Judge's Report and Recommendation (Doc. 87) is **adopted** in full except to the extent that it finds a genuine dispute regarding whether the term "good and marketable" as used in the produce sales agreement incorporated a color requirement of 90% "green and breakers."

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 67) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 69) is **denied**.

Dated this 3rd day of February, 2015.

_____
Honorable Rosemary Márquez
United States District Judge